# In the United States Court of Federal Claims
BID PROTEST
No. 18-678C
(Filed Under Seal: August 27, 2018 | Reissued: September 7, 2018)[*]

|   |   |
|---|---|
| ULTRA ELECTRONICS OCEAN SYSTEMS INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, |
| v. |
| THE UNITED STATES OF AMERICA, |
| Defendant. |

Keywords: Bid Protest; 28 U.S.C. § 1491; Motion to Supplement the Administrative Record; United States Navy; Exclusion from the Competitive Range; Prior Procurement.

*Maurice A. Bellan*, Baker & McKenzie LLP, Washington, D.C., for Plaintiff.

*P. Davis Oliver*, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, Washington, D.C., for Defendant, with whom were *Lisa L. Donahue*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General.

**OPINION AND ORDER**

**KAPLAN, Judge.**

In this pre-award bid protest, Plaintiff Ultra Electronics Ocean Systems Inc. challenges its exclusion from a competition to develop and supply the United States Navy with the ADC MK 5, an acoustic torpedo countermeasure. The Naval Sea Systems Command (NAVSEA) rated Ultra's technical proposal unacceptable because Ultra failed to demonstrate that its proposed design would meet the solicitation's launch trajectory requirement. Ultra contends that the solicitation did not require offerors to submit the data that the Navy alleged was missing from its proposal and that, in any event, NAVSEA failed to provide notice that providing such data was a mandatory minimum requirement for award. It also argues that the decision to exclude its proposal from consideration was arbitrary and capricious because it was allegedly inconsistent with NAVSEA's approach in a prior, allegedly similar solicitation, in which NAVSEA gave a similar Ultra proposal an "outstanding" rating.

---

[*] This opinion was originally issued under seal and the parties were given the opportunity to request redactions. The opinion is now reissued with redactions noted in brackets.

Currently before the Court are the parties' cross-motions for judgment on the administrative record. For the reasons set forth below, the Court concludes that the Navy's decision to exclude Ultra from the competition was not arbitrary and capricious or contrary to law. Ultra's motion for judgment on the administrative record is therefore **DENIED** and the government's motion for judgment on the administrative record is **GRANTED**.

**BACKGROUND**

**I.      The Solicitation**

The United States Navy is in the process of procuring a next-generation acoustic device countermeasure, known as the ADC MK 5. See Admin. R. (AR) Tab 1 at 1. The ADC MK 5 "is an expendable, electro-acoustic torpedo countermeasure device . . . that is launched out of a submarine's 3-inch signal ejector and the 6-inch external countermeasure launchers." Id. at 11. When the device is deployed it "produce[s] deceptive targeting information to acoustic homing torpedoes to alter their course from the target submarine." Id.

In December 2010, as part of its initial effort to develop and procure the ADC MK 5, the Navy awarded two contracts for the design and delivery of engineering development models, one of which went to Ultra. Id. at 9. Due to budgetary constraints, however, development was delayed and the Navy ultimately issued stop work orders on the two contracts in November 2014. Id.

Thereafter, the Navy revised its acquisition strategy for the ADC MK 5. Under the revised strategy, a single contractor would continue the engineering and manufacturing development phase, which would "consist[] of ADC MK 5 system design, development, fabrication, test, integration[,] and system capability demonstration." See id. Tab 3 at 99. To that end, on February 17, 2017, the Navy issued solicitation number N00024-16-R-6247, id. Tab 16 at 337, which was subsequently amended several times, id. Tabs 17–19.

In its general instructions, the solicitation directed offerors to "submit all information required by th[e] RFP" and cautioned that "[f]ailure to comply with the terms and conditions of the RFP [could] result in the Offeror being disqualified from consideration for award." Id. Tab 21 at 1669. The solicitation also incorporated FAR 52.215-1(f), which states that "[t]he Government may reject any or all proposals if such action is in the Government's interest." Id. at 1698. Additionally, it gave notice that the Navy intended to "award a contract without discussions," but that it "reserve[d] the right to conduct discussions if the Contracting Officer" determined them to be necessary. Id. Further, the instructions stated that "[i]f an Offeror fails to comply with content requirements its proposal may be downgraded or disqualified for failure to follow instructions." Id. at 1672.

The solicitation required that all proposals contain three volumes: 1) a technical proposal; 2) a cost/price proposal; and 3) a solicitation package. Id. at 1670. Section L of the solicitation set forth the factors that offerors were required to address in each volume. In particular, and as relevant to this case, section L required that all technical proposals "contain a response to each of the [listed] evaluation Factors and Sub-factors." Id. at 1673. Factor 1—technical approach—was the most important. Id. And within factor 1, sub-factor 1.1, "Prime Item Performance Specification Requirements," was the most important component. Id.

At issue in this case is whether Ultra's technical proposal adequately addressed sub-factor 1.1, particularly as to the solicitation's performance requirements regarding launch trajectory. With respect to sub-factor 1.1, the solicitation provided that the "Offeror[] shall demonstrate how the proposed design will meet performance requirements of the solicitation during all phases of the device's function life." Id. at 1674. It also stated that "[t]he Offeror shall describe how they will meet the requirements defined in the Prime Item Performance Specification (PIPS)." Id.[1] In particular, and as pertinent to this case, Section L 3.1.1.1(e) required offerors to "describe how they will meet the Characteristics requirements identified in section 5.4 of the PIPS." Id.

One such "Characteristics Requirement" was described at PIPS section 5.4.8.5. Captioned "Launch Trajectory Profile," section 5.4.8.5 states as follows:

> The Contractor shall demonstrate the ADC MK 5 produced by this specification meets specified launch trajectories [***]. The device shall not impact or damage the submarine in any way for all launch trajectories. The physical characteristics identified in paragraph 5.4.9 have previously been modeled by the Navy and have demonstrated satisfactory trajectory results. The Contractor is given the option of using the characteristics defined in paragraph 5.4.9 without conducting any additional trajectory modeling. If the Contractor deviates from the characteristics in paragraph[] 5.4.9, the contractor must demonstrate to the procuring authority that the resulting trajectory meets the specified launch trajectories [***]. The contractor shall submit their trajectory predictions to the procuring authority for approval. The Navy will use the Undersea Vehicle Launch Dynamic Simulation (UVLDS) trajectory model located at Naval Undersea Warfare Center, Newport to validate the Contractor's trajectory predictions. The Contractor shall be responsible for all costs associated with the trajectory predictions and additional testing if required.

Id. Tab 37 at 5002.

The criteria for determining offerors' compliance with the requirements of the solicitation were set out in section M. Id. Tab 21 at 1709. That section provided that "[t]o be considered eligible for award, each Offeror shall submit a response to the RFP that contains a complete response to the requirements of this solicitation." Id. With respect to Sub-factor 1.1 in particular, the evaluation section stated that the Navy would "evaluate the comprehensiveness, feasibility, effectiveness and compliance with the PIPS." Id. at 1712. It further stated that the government would "evaluate the Offeror's design for the degree to which [it] will meet the requirements of

---

[1] The PIPS were contained in a classified attachment to the solicitation. See AR Tab 21 at 1644. The Court has reviewed the attachment. In this opinion, the Court will quote from the descriptions of the PIPS contained in unclassified documents that are included in the administrative record.

[the PIPS] and the degree to which the proposal demonstrates an understanding of [a listing of relevant subject areas]." Id.

## II. Ultra's Proposal

The Navy received [***] proposals in response to the solicitation, one of which was Ultra's. Id. Tab 29 at 4636; see also id. Tab 23 at 1731. In its technical volume, Ultra addressed PIPS sections 5.4.8.5 and 5.4.9. It first described certain physical properties of its device and wrote that "UVLDS [Undersea Vehicle Launch Dynamic Simulation] will be performed to verify non-contact with the submarine." Id. Tab 23 at 1790. Ultra then stated that it understood PIPS paragraphs 5.4.9.1–9.7 to "define the characteristics for the ADC MK2," and that those characteristics were "provided for reference only." Id. at 1791. It noted that "[t]he physical characteristics of [Ultra's] ADC MK5 are quite different [from] the ADC MK2." Id. at 1793; see also id. Tab 28 at 4589. "[T]herefore," Ultra stated, "UVLDS analysis will need to be performed to model launch trajectories and launch loading." Id. Tab 23 at 1793.

## III. The Source Selection Evaluation Board's Report

On January 23, 2018, the Navy's Source Selection Evaluation Board (SSEB) issued a report documenting its evaluation of the offerors' technical proposals. Id. Tab 28 at 4584. The SSEB rated Ultra's technical proposal unacceptable. Id. at 4587.[2] It identified four deficiencies in the proposal, along with some twenty weaknesses (two of which were characterized as "significant"). Id.[3] Pertinent to this case, one of the identified deficiencies concerned compliance with the PIPS provisions addressing "launch trajectory." Id. at 4587–88. The SSEB assigned Ultra's proposal a deficiency with respect to launch trajectory because it "failed to describe or demonstrate an approach to meet the physical characteristics of the launch trajectory requirements in PIPS Sections 5.4.9 and 5.4.8.5 identified in Section L 3.1.1.1e." Id. at 4588.

The SSEB rejected Ultra's assertion that section 5.4.9 of the PIPS defined the physical characteristics of the ADC MK 2 "for reference only." Id. The SSEB stated that section 5.4.9 was "a specific requirement that minimizes testing requirements if met." Id. at 4588–89. Because Ultra's proposed device did not possess the physical characteristics described in PIPS section 5.4.9, according to the SSEB, its proposal was required "to demonstrate [that its] proposed ADC MK 5 device meets the requirements of PIPS Section 5.4.8.5" for launch trajectory. Id. at 4589.

---

[2] Under the solicitation, ratings for an offeror's technical proposal could range from outstanding to unacceptable. AR Tab 21 at 1710. "An evaluation of 'Unacceptable' in any single technical factor [could] result in the Offeror's proposal being rated as unacceptable overall, and eliminated from further consideration." Id. at 1712.

[3] Under the solicitation, a "deficiency" exists where the proposal contains a "material failure . . . to meet a Government requirement or a combination of significant weaknesses . . . that increases the risk of unsuccessful contract performance to an unacceptable level." AR Tab 21 at 1709.

The SSEB concluded that Ultra did not "demonstrate how [its] proposed deviation from [the physical characteristics set forth in section 5.4.9] would still meet the required launch trajectory." Id. Specifically, it explained, "[t]he Offeror fails to provide any description or details that allow the government to evaluate the comprehensiveness, feasibility, or effectiveness with the PIPS launch trajectory requirements." Id. Further, it opined that Ultra's proposal lacked "any substantiating information to support that their device will meet the requirements of PIPS Section 5.4.8.5." Id. The SSEB concluded that the lack of such information created "an unacceptable risk that could result in significant redesign and testing schedule adjustments." Id.; see also id. at 4590 (opining that "[Ultra's] lack of understanding of launch trajectory requirements for the ADC MK 5 device is an unacceptable risk that can result in extensive schedule delays and cost growth to modify [Ultra's] ADC MK 5 device to meet launch trajectory requirements" and that "[t]his is a material failure of the proposal to meet a Government requirement that increases the risk of unsuccessful contract performance to an unacceptable level").

The SSEB report suggested three follow-up "technical questions" covering launch trajectory, two of which are pertinent to this bid protest. First, it asked Ultra to "[p]rovide test data or analysis demonstrating that the proposed design's launch trajectory profile meets all PIPS requirements." Id. at 4590. Second, it asked Ultra to "[d]escribe any modeling tools [it] intends to use for the launch trajectory analysis prior to submittal to [the] government for verification with UVLDS (Underwater Vehicle Launch Dynamics Simulation)." Id.

**IV.   The Source Selection Advisory Council's Recommendation**

The SSEB forwarded its report to the Source Selection Advisory Council (SSAC) for its consideration on January 23, 2018. Id. at 4584. The SSAC then issued its own report and recommendations on February 28, 2018. Id. Tab 29 at 4629–30.

In its report, the SSAC "concur[red] with the findings of the SSEB and adopt[ed] them as its own," with certain exceptions not relevant here. See id. at 4645. It stated that "[f]our deficiencies have been identified in Sub-factor 1.1 that render the Offeror's proposal Unawardable." Id. at 4646. One of these was the launch trajectory deficiency discussed above. See id.

The SSAC noted that while Ultra's technical proposal had four deficiencies "that make it unawardable," its [***]. Id. at 4653. It therefore recommended "that the contracting officer attempt to resolve [Ultra's] deficiencies and weaknesses during discussions." Id. at 4646; see also id. Tab 30 at 4654. The contracting officer and the Source Selection Authority (SSA) both concurred in the SSAC's recommendations. Id. Tab 30 at 4654.

**V.   Discussions**

On March 7, 2018, the Navy's contracting officer contacted Ultra to "commence[] discussions." Id. Tab 31 at 4655. She wrote that the "Navy requests that you provide responses to the discussion questions found within" and included both a list of the four deficiencies the SSEB identified in Ultra's proposal and the technical questions the SSEB had drafted. Id. at 4655–92. With respect to launch trajectory in particular, she advised Ultra that "the proposal contains

5

insufficient information to describe or demonstrate the[] ADC MK5 device will meet the Launch Trajectory requirements of the [PIPS]." Id. at 4658. She also supplied Ultra with a copy of the SSEB's technical evaluation in which it had set forth its concerns. Id. at 4659.

Ultra submitted its responses shortly thereafter. Id. Tab 35. As noted above, the SSEB's first technical question asked Ultra to "[p]rovide test data or analysis demonstrating that the proposed design's launch trajectory profile meets all PIPS requirements." Id. Tab 28 at 4590. As part of its response, Ultra provided seven photographs, including six underwater launch photographs. See id. Tab 35a at 4812. Referencing the photographs, Ultra asserted that "[e]mpirical testing using Ultra's portable 3 inch diameter launcher and a mock-up of our proposed ADC MK5 design (i.e. same shape and mass properties) provides substantial confidence that the proposed design's launch trajectory profile meets the PIPS requirements." Id. at 4811. Ultra also described its launcher and its indoor testing pool and represented that "[m]ultiple launches were performed which resulted in repeatable stable trajectory profiles." Id. Ultra advised the Navy that its "testing demonstrates high confidence that our ADC MK5 design can safely separate from the specified platforms without re-contacting the hull at all speeds and without limitation on maneuvers." Id. It concluded that "[b]ased on the results of our launch testing and past performance with UVLDS . . . we are confident in meeting all PIPS Section 5.4.8.5 requirements." Id.

Ultra also responded to the second technical question, requesting that it identify the modeling tools it intended to use "for the launch trajectory analysis prior to submittal to [the] government for verification with UVLDS." Id. at 4813. Ultra stated that it intended "to use . . . UVLDS as it is the only validated modeling tool that can accurately predict separation of devices from all the Navy submarines at speed and while maneuvering." Id. Ultra stated that it "plan[ned] to perform this analysis for the ADC MK5 as part of [its] risk mitigation process early in the program." Id. It also referred the Navy to its initial proposal, in which Ultra stated that it would fund testing with UVLDS. Id.

**VI. The SSEB's Review of Ultra's Responses to the Discussion Questions**

The SSEB reviewed Ultra's responses and summarized its evaluation in a spreadsheet. Id. Tab 37. The SSEB concluded that Ultra had failed to address "Deficiency 01: Launch Trajectory." Id. at 5002. It wrote that Ultra "did not provide substantive analysis and/or data to resolve this deficiency." Id. In addition, the SSEB concluded, Ultra "has not demonstrated through trajectory modeling, predictions, test data, or analysis that its proposed design has a launch trajectory that will not impact or damage the submarine in any way." Id.

In particular, the SSEB rejected Ultra's reliance on its photographs. Id. According to the SSEB, the photos Ultra provided "do not demonstrate that the device will not impact or damage the submarine." Id. It opined that Ultra's "portable launcher and the setup described in the photos is not representative of any submarine launch." Id. Further, the SSEB criticized Ultra's failure to "provide[] . . . data or modeling analysis to demonstrate the launch trajectory," finding that absent such data and analysis "the Government is unable to evaluate the Offeror's compliance with the solicitation." Id. It explained that if Ultra "waits to perform any trajectory analysis until 'early in the program' as it suggests, it will be too late to correct any design flaws without severely impacting the cost and schedule." Id. The SSEB opined that accepting Ultra's offer

6

given these concerns would "represent[] a significant risk to the Government." Id. (also noting that Ultra "did not identify any tool or test data other than a statement that they plan to run UVLDS after contract award, during early development," and that Ultra "has not conducted or provided any detailed analysis or identified modeling tools which would allow the government to validate its launch trajectory, as discussed in PIPS 5.4.8.5, with any degree of confidence").

### VII. Ultra's Elimination from the Competitive Range

On May 1, 2018, the SSAC prepared a memorandum for the file entitled "Competitive Range Determination After Discussions." Id. Tab 39 at 5007. In it, the SSAC noted its review of the discussion responses and the SSEB's new evaluation, and made three recommendations: 1) "to close discussions"; 2) to include the second offeror "in the competitive range and request Final Proposal Revisions"; and 3) "to exclude Ultra from the competitive range for failing to address a remaining technical deficiency." Id. The SSAC stated that Ultra's "response to the launch trajectory deficiency from Technical Questions (TQ) 1-3 lacked sufficient detail and failed to demonstrate its device's launch trajectory in accordance with PIPS Section[s] 5.4.9 and 5.4.8.5." Id. at 5009. "Therefore," the SSAC continued, "Ultra has no realistic chance of contract award without submitting an entirely different proposal." Id. As a result, because "Ultra's proposed technical solution fundamentally fails to meet the Government's requirements" and because "Ultra was given the opportunity to provide the launch trajectory analysis in support of [its] proposal and failed to respond," the SSAC "recommend[ed] concluding discussions and excluding Ultra from the competitive range." Id. at 5011. Both the contracting officer and SSA concurred in this recommendation. Id. at 5012.

That same day, the contracting officer sent a letter to Ultra informing it of the Navy's decision. Id. Tab 40 at 5015. The contracting officer stated that "[t]he Government has determined that Ultra has submitted a technically unacceptable proposal" and it was therefore "excluded from the competitive range and . . . ineligible for award." Id. The contracting officer explained that "the Government asked Ultra to provide substantiating information to demonstrate its device's launch trajectory . . . [but] Ultra failed to do so." Id. She advised Ultra that "[t]his deficiency remains an unacceptable risk as it may result in significant redesign and testing schedule adjustments." Id. at 5016. For that reason, the contracting officer informed Ultra that its proposal was "unawardable." Id.

### VIII. Ultra's Objections to Its Exclusion

On May 4, 2018, Ultra submitted a response to the notice of exclusion. Id. Tab 41. It contended that the solicitation contained "no requirement for the launch trajectory predictions to be included in Offerors['] proposals for evaluation." Id. at 5023. Ultra noted that its proposal had indicated its intent to "meet the PIPS requirement" by funding an agreement "to perform UVLDS post contract award for determination of launcher exit loading and device trajectory for all relevant platforms." Id. at 5024. In addition, Ultra observed that it had "provided additional information including test data in the form of photographic evidence demonstrating good separation and stable flight of its ADC MK5 device . . . when launched from Ultra's portable SSE launcher." Id. "This information was provided," Ultra explained, "to demonstrate Ultra's understanding of the requirement and to reduce program risk." Id. Ultra also cited the launch trajectory requirement of the solicitation for the earlier acoustic device countermeasure contract,

7

which it claimed was the same as the requirement for the current solicitation. Id. According to Ultra, it had submitted a similar plan to fund post-contract UVLDS testing in its proposal for that earlier contract, and its approach was rated "outstanding." Id. Further, Ultra claimed that when it submitted that plan, NAVSEA had opined that Ultra's use of its SSE launcher to simulate launch of the ADC MK 5 device was a "major strength that reduces launch-related issues and risks." Id. (quotation and emphasis omitted).

On May 9, 2018, the Navy responded to Ultra's letter, summarily rejecting its contentions. Id. Tab 42 at 5026. It concluded that the deficiency that had been identified "remain[ed] an unacceptable risk and render[ed] Ultra's proposal unawardable." Id.

## IX. This Action

On May 11, 2018, Ultra filed its complaint in this court challenging its exclusion from the competitive range. Compl., ECF No. 1. Ultra asserts that the Navy "unreasonably evaluated Ultra's Proposal in contravention to the Solicitation's evaluation factors and the requirements of the Federal Acquisition Regulation ('FAR') to exclude Ultra from the competitive range." Id. ¶ 55. Specifically, it alleges that the Navy's "evaluation of Ultra's launch trajectory substantiation . . . was . . . unreasonable, and arbitrary, capricious, and not in accordance with law." Id. ¶ 59. Ultra seeks injunctive relief requiring the Navy to reevaluate Ultra's proposal in a reasonable manner and in accordance with the terms of the solicitation. Id. at 24–25.

The government filed the administrative record on May 25, 2018. See ECF No. 15. On June 13, 2018, Ultra filed both a motion to supplement the administrative record and a motion for judgment on the administrative record. ECF Nos. 24–25. The government opposed Ultra's motion to supplement the record and has filed its own motion for judgment on the administrative record. ECF Nos. 27, 32. The Court held oral argument on the motions on August 15, 2018, during which it granted Ultra's motion to supplement in part.

## DISCUSSION

### I. Subject Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v.

United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359.

In a pre-award protest, to possess the direct economic interest necessary for standing, a protester must have suffered a non-trivial competitive injury that can be addressed by judicial relief. See Weeks Marine, Inc., 575 F.3d at 1361–62. Even more specifically, in a pre-award, post-evaluation protest, the protester meets this standard if, absent the alleged errors, it would have a "substantial chance" of receiving the award; that is, if the protester "could have likely competed for the contract" but for the alleged errors. Orion Tech., 704 F.3d at 1348–49. The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)).

Ultra, an actual offeror, challenges its elimination from the competitive range, a procurement decision falling within the Court's "broad grant of jurisdiction over objections to the procurement process." Sys. Application & Techs., Inc., 691 F.3d at 1381. Moreover, Ultra has sufficiently alleged a direct economic interest in the procurement. It held one of the two contracts for prior development work on the ADC MK 5, under which its performance was rated highly. It was also [***] offerors in the current procurement and it proposed [***]. Additionally, Ultra alleges that it has been the premier provider of submarine countermeasures for the United States Navy. Thus, absent the Navy's allegedly erroneous decision to exclude Ultra because of the launch trajectory issue, Ultra would have continued competing for the contract and would have had a substantial chance of receiving the award. Accordingly, Ultra is an interested party and the Court has subject matter jurisdiction over its claim.

## II.     Ultra's Motion to Supplement the Administrative Record

As noted above, Ultra moved to supplement the administrative record. It sought to add three documents: 1) the Navy's 2009 request for proposals that led to Ultra's 2010 contract for the ADC MK 5; 2) the PIPS from that solicitation; and 3) Ultra's final bid on that solicitation. Pl.'s Mot. to Suppl. the Admin. R. at 1, ECF No. 24. At oral argument, the Court granted Ultra's motion in part, directing that the 2009 request for proposals and Ultra's 2010 bid be added to the record. See Order, ECF No. 36.[4] The Court now sets forth its reasoning for that ruling.

It is well established that, in a bid protest case, the Court of Federal Claims is to "apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents" to it. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed.

---

[4] Because the parties stipulated at oral argument that the quoted portion of the 2009 PIPS in Ultra's pleadings was accurate, the Court found it unnecessary to supplement the record with the 2009 PIPS.

9

Cir. 2009). Therefore, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Id. (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). "[S]upplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." Id. (quotation omitted). In this case, the Court concludes that this narrow standard has been met.

A primary theme of Ultra's case is that the solicitation and Ultra's proposal for the 2009–10 ADC MK 5 procurement were "functionally identical" to the solicitation and its proposal for the present procurement. Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on the Admin. R. (Pl.'s Mem.) at 24, ECF No. 25-1. Yet in the prior procurement, Ultra's technical proposal was rated "outstanding," and in the present one it was found "unacceptable." Id. at 27. According to Ultra, the contracting officer was obligated to reconcile and explain the reason for the disparate ratings, and her failure to do so was arbitrary and capricious. See id. at 24–29.

The Court ultimately concludes, for the reasons set forth below, that the contracting officer was not obligated to reconcile the different ratings assigned to Ultra's technical proposals in the two procurements. Nonetheless, in order to promote effective review of the parties' arguments on that point, it was necessary for the Court to have access to the relevant documents from the earlier procurement. For that reason, the Court granted Ultra's motion to supplement the administrative record with the 2009 solicitation and Ultra's 2010 bid.

### III.     Bid Protest Standards

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims (RCFC), the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007), aff'd, 285 F. App'x 746 (Fed. Cir. 2008). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

In a bid protest, the Court weighs challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Thus, the Court cannot substitute

Cir. 2009). Therefore, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Id. (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). "[S]upplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." Id. (quotation omitted). In this case, the Court concludes that this narrow standard has been met.

A primary theme of Ultra's case is that the solicitation and Ultra's proposal for the 2009–10 ADC MK 5 procurement were "functionally identical" to the solicitation and its proposal for the present procurement. Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on the Admin. R. (Pl.'s Mem.) at 24, ECF No. 25-1. Yet in the prior procurement, Ultra's technical proposal was rated "outstanding," and in the present one it was found "unacceptable." Id. at 27. According to Ultra, the contracting officer was obligated to reconcile and explain the reason for the disparate ratings, and her failure to do so was arbitrary and capricious. See id. at 24–29.

The Court ultimately concludes, for the reasons set forth below, that the contracting officer was not obligated to reconcile the different ratings assigned to Ultra's technical proposals in the two procurements. Nonetheless, in order to promote effective review of the parties' arguments on that point, it was necessary for the Court to have access to the relevant documents from the earlier procurement. For that reason, the Court granted Ultra's motion to supplement the administrative record with the 2009 solicitation and Ultra's 2010 bid.

### III.     Bid Protest Standards

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims (RCFC), the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007), aff'd, 285 F. App'x 746 (Fed. Cir. 2008). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

In a bid protest, the Court weighs challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Thus, the Court cannot substitute

its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Instead, the Court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action"). A disappointed offeror "bears a heavy burden" in attempting to show that the agency's decision lacked a rational basis. Impresa Construzioni, 238 F.3d at 1338.

## IV. The Merits

### A. Ultra's Argument That the Navy Applied Standards Regarding Launch Trajectory That Were Not Set Forth in the Solicitation

As explained above, Ultra's proposal was rated unacceptable with respect to Sub-factor 1.1 of the technical evaluation criteria. The Navy found Ultra's proposal deficient because it "failed to describe or demonstrate an approach to meet the physical characteristics of the launch trajectory requirements in PIPS Sections 5.4.9 and 5.4.8.5 identified in Section L 3.1.1.1e." AR Tab 28 at 4588. Further, the Navy concluded that Ultra failed to "provide substantive analysis and/or data to resolve the deficiency" as to Sub-factor 1.1 when given an opportunity to do so during discussions. Id. Tab 37 at 5002. In particular, the Navy cited Ultra's failure to demonstrate "through trajectory modeling, predictions, test data, or analysis that its proposed design has a launch trajectory that will not impact or damage the submarine in any way." Id.

Ultra contends that the Navy applied a standard to its proposal that was not set forth in the solicitation. For the reasons set forth below, this contention lacks merit.

#### 1. PIPS Requirements

The solicitation required offerors, in their technical proposals, to "describe how they will meet the requirements defined in the Prime Item Performance Specification (PIPS)," and more specifically "how they will meet the Characteristics requirements identified in section 5.4 of the PIPS." Id. Tab 21 at 1674. The critical characteristic requirement set forth in section 5.4.8.5 was the requirement that the proposed device have a launch trajectory that would "not impact or damage the submarine in any way." Id. Tab 37 at 5002.

Section 5.4.8.5 also imposes obligations, post-award, to ensure that the proposed device does meet this characteristic requirement. It requires the contractor to "demonstrate" that its device "meets specified launch trajectories [***]." Id. And it provides two avenues by which this requirement may be met.

First, section 5.4.8.5 gives the contractor "the option of using the characteristics defined in paragraph 5.4.9 without conducting any additional trajectory modeling." Id. Second, if the

design of the proposed device deviates from those characteristics (as it does in this case), the contractor must "submit [its] trajectory predictions to the procuring authority for approval." Id. Section 5.4.8.5 further specified that the Navy would use the UVLDS trajectory model to determine the validity of the contractor's predictions, and that the testing would be performed at the contractor's expense. Id.

PIPS section 5.4.8.5 serves several purposes. It supplies a characteristics requirement for the ADC MK 5: that it not impact or damage the submarine upon deployment. In addition, it imposes an obligation on the contractor post-award to demonstrate that its device does meet "specified launch trajectories." And finally, it specifies the methods by which the Navy will validate that the device meets specified launch trajectories before the device is further developed and ultimately put into production.

### 2. The Basis for Ultra's Unacceptable Rating

Ultra argues that there is nothing in the solicitation that imposes any obligation on offerors, pre-award, with respect to launch trajectory matters. In this regard, it emphasizes that PIPS section 5.4.8.5 provides the means by which the eventual contractor demonstrates that its device is in compliance with performance requirements, and that the demonstration is one that must be made post-award.

Ultra's argument cannot be reconciled with the express provisions of the solicitation, which required offerors "to describe" in their proposals "how they will meet the requirements defined in the [PIPS]." Id. Tab 21 at 1674. In other words, Ultra was required to "describe or demonstrate" in its proposal the "approach" it would use to ensure that its device would meet the performance requirements, thus giving the Navy some assurance pre-award that Ultra's trajectory predictions would be validated post-award when the Navy conducted UVLDS testing. See id. Tab 28 at 4588.

Ultra's proposal was found deficient because it contained no demonstration or description of how it intended to meet the performance requirements; it simply restated what was in PIPS section 5.4.8.5—i.e., that UVLDS would be used to validate its trajectory predictions post-award. But that statement did not describe the approach Ultra had taken and/or would continue to take to ensure that its device would comply with the characteristics requirement set forth in PIPS section 5.4.8.5 when the Navy performed its post-award validation testing as required by that section. As the SSEB explained, Ultra "fail[ed] to provide any description or details that allow the government to evaluate the comprehensiveness, feasibility, or effectiveness with the PIPS launch trajectory requirements." Id. at 4589. It concluded that the proposal lacked "any substantiating information to support that their device will meet the requirements of PIPS Section 5.4.8.5." Id.

It is significant that Ultra was supplied with a copy of the SSEB's evaluation and was given a chance to cure this deficiency in discussions. The Navy asked Ultra to supply the test data or analysis that it had used to determine that its device's launch trajectory would not result in impact or damage to the submarine. See id. Tab 31 at 4662. It also asked Ultra to "[d]escribe any modeling tools [that it] intend[ed] to use for the launch trajectory analysis prior to submittal to [the] government for verification with UVLDS." Id. In response, Ultra asserted that it had

12

conducted multiple test launches in its own indoor testing pool, and that such testing "demonstrates high confidence that [its] ADC MK5 design can safely separate from the specified platforms without re-contacting the hull at all speeds and without limitation on maneuvers." Id. Tab 35a at 4811. In support of its "high confidence" assessment, Ultra submitted several photos taken of a launch it had conducted on its own portable launcher. See id. at 4812.

As discussed above, the SSEB concluded that Ultra's responses during discussions were insufficient to address the Navy's concerns. It opined that Ultra's portable launcher and corresponding photographs did not reflect an actual submarine launch. Id. Tab 37 at 5002. Further, the Navy noted that Ultra had not provided any data or other modeling analysis for the government to evaluate. Id. The SSEB explained that waiting to perform any trajectory analysis until after award, even if done early in the program, would be "too late to correct any design flaws without severely impacting the cost and schedule." Id. For these reasons, the SSEB opined that Ultra's proposal presented "a significant risk to the Government" that merited its exclusion from the competition. Id. This conclusion was one that was well within its significant discretion to determine compliance with the technical requirements of the solicitation.

### B. Ultra's Argument That the Navy Failed to Notify Offerors of the Consequences of Failure to Meet the Launch Trajectory Requirement

Ultra also argues that even assuming the Navy did not apply an unstated requirement to its proposal, "[its] decision still cannot stand because [it] failed to notify the offerors that failure to meet this requirement would result in an outright rejection of their proposal." Pl.'s Mem. at 23 (citing Mantech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 67 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002) (per curiam)). At the very least, Ultra argues, the requirement served as a "predominant factor" in the Navy's decision, and the offerors, according to Ultra, were not given sufficient notice of its importance. Id. at 24 (citations omitted).

These contentions lack merit. The solicitation warned offerors that "[t]o be considered eligible for award, each Offeror shall submit a response to the RFP that contains a complete response to the requirements of this solicitation." AR Tab 21 at 1709. It provided that technical factors were the most important requirements for purposes of the evaluation and that an "unacceptable" technical rating would mean that a proposal was "unawardable"; an unacceptable rating would be given to a "[p]roposal [that] does not meet [the] requirements of the solicitation, and thus, contains one or more deficiencies, and/or [the] risk of unsuccessful performance is unacceptable." Id. at 1710.

Further, section M of the solicitation advised offerors that "[t]he Government will evaluate the Offeror's design for the degree to which the Offeror's design will meet the requirements of the Attachment 1 PIPS." Id. at 1712. Therefore, the solicitation provided that "[t]he Offeror shall describe how they will meet the requirements defined in the Prime Item Performance Specification (PIPS)," and in particular required offerors to "describe how they will meet the Characteristics requirements identified in section 5.4 of the PIPS." Id. at 1674.

Lastly, to the extent that Ultra did not have a clear understanding of what was required of it with respect to PIPS section 5.4.8.5, the Navy initiated discussions, provided Ultra with a copy of the SSEB's initial evaluation report, and also gave Ultra the opportunity to respond to specific

questions requesting more data and test analysis. See id. Tab 31. Under these circumstances, Ultra's argument that it was somehow "sandbagged" when it was excluded from the competition rings hollow.

C. **Ultra's Argument That the Phrase "Specified Launch Trajectories" Used in PIPS 5.4.8.5 Is Ambiguous**

Ultra next argues that even assuming it was required, pre-award, to demonstrate how its device would meet "specified launch trajectories" (as provided in PIPS section 5.4.8.5), the term "specified launch trajectories" is "so vague and ambiguous as to not amount to any verifiable requirement." Pl.'s Mem. at 22. According to Ultra, "for the 'meets specified launch trajectories' language to have meaning as a pre-award requirement, NAVSEA would have needed to provide a set of time-based, three dimensional spatial position data" and that "the missing 'specified launch trajectories' information would have had to be extensive." Pl.'s Reply in Further Supp. of Its Mot. for J. on the Admin. R. & Resp. to Def.'s Cross Mot. for J. on the Admin. R. at 15, ECF No. 34.

It is unclear to the Court whether there is any merit to Ultra's argument that the phrase "specified launch trajectories" describes data that the Navy will supply post-award, rather than being another way to characterize the contractor's "trajectory predictions" referenced elsewhere in PIPS section 5.4.8.5. But in any event, the ambiguity argument comes too late. Any alleged ambiguity was apparent on the face of the solicitation and PIPS section 5.4.8.5. Because Ultra waited to raise this alleged flaw until after it submitted its proposal and received a negative evaluation, Ultra has waived any challenge to the Navy's use of the phrase "specified launch trajectories" in PIPS section 5.4.8.5. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313–15 (Fed. Cir. 2007); see also COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381–83 (Fed. Cir. 2012).

D. **Ultra's Argument That the Navy's Decision Was Arbitrary and Capricious Because It Applied Different Standards When Evaluating Ultra's 2010 and 2017 Technical Proposals without Explaining Its Reasoning**

Finally, Ultra argues that the Navy's decision to exclude its proposal from further consideration was arbitrary and capricious because the Navy failed to explain why Ultra's technical proposal in this procurement was rated unacceptable, given that Ultra received an "outstanding" rating for what it alleges was a materially indistinguishable proposal in connection with the 2009 procurement. In support of that proposition, it cites several decisions arising under the Administrative Procedure Act (APA), in which agency rule changes or adjudicatory decisions that departed from past precedent were found arbitrary and capricious because the agency failed to explain the reasoning underlying its change in position. See Pl.'s Mem. at 24–29; see also id. at 25 (observing that "[t]he dominant law clearly is that an agency must either follow its own precedents or explain why it departs from them" (quoting Richard J. Pierce, Jr., Administrative Law Treatise § 11.5 (5th ed. 2010))).

Ultra is correct that it is a basic principle of agency rulemaking and adjudication that an agency must supply a reasoned explanation for departing from its own precedent or prior reasoning. See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 42 (holding that "an agency changing its

14

course by rescinding a rule is obligated to supply a reasoned analysis for the change"). But the decisions of contracting officers are fundamentally different from the decisions reached in agency rulemaking proceedings and adjudications that are the subject of APA review in the cases upon which Ultra relies.

Thus, when an agency engages in rulemaking or adjudicates claims pursuant to its statutory authority, the resulting decisions represent single, official positions that serve as the decisions of the agency for all purposes. Procurement decisions, by contrast, are made by individual contracting officers and bind no one but the parties to that particular procurement. See Impresa Construzioni, 238 F.3d at 1339 (observing that a procurement decision "is not the decision of the agency or agency head, but the decision of the contracting officer—an individual within the agency"). Moreover, contracting officers and/or the members of the evaluation panels that advise them may vary from procurement to procurement. Contracting officers are under no obligation to conform their decisions to the decisions of other contracting officers; indeed, a central feature of a contracting officer's position is the broad discretion and judgment he or she is afforded to make procurement decisions. See id. at 1340–41 (cautioning that "the contracting officer enjoys wide discretion in making his determinations" (quotation omitted)).

For these reasons, in this Court's view, contracting officers have no obligation to explain or distinguish past procurement decisions when making determinations under new procurements. Instead, "each procurement stands alone, and a selection decision made under another procurement does not govern the selection under a different procurement." SDS Int'l v. United States, 48 Fed. Cl. 759, 772 (2001) (quoting Renic Corp., B–248100, 92–2 CPD ¶ 60 (Comp. Gen. July 29, 1992)); see also Guardian Moving & Storage Co. v. United States, 122 Fed. Cl. 117, 132 (2015) (contracting officer not bound by determinations made in separate procurement); Griffy's Landscape Maint. LLC, v. United States, 51 Fed. Cl. 667, 671 (2001) ("[A]n attack upon a new solicitation or upon any other aspect of the administration of the previous contract, must stand on its own.").

The cases upon which Ultra relies for a contrary position are distinguishable. In Ceres Environmental Services, Inc. v. United States, 52 Fed. Cl. 23 (2002), for example, the court did not rule that contracting officers are bound by their own or other contracting officers' prior decisions and so must explain any potential inconsistencies with prior determinations. See id. at 37. To the contrary, although Ceres was a bid protest, the court was reviewing a decision by the Small Business Administration exercising its authority to make a size classification determination through its Office of Hearings and Appeals. See id. That decision is thus analogous to the decisions in the APA cases upon which Ultra relies. And Laboratory Corporation of America Holdings v. United States, 116 Fed. Cl. 643 (2014), another case Ultra cites, is also distinguishable. In that case, the court found arbitrary and capricious the agency's inconsistent treatment of two offerors' bids within the same procurement, not across separate procurements. See id. at 652–53.

Finally, and in any event, Ultra has not shown that the solicitation at issue in this case is materially indistinguishable from the 2009 solicitation; it has merely asserted that to be the case. See Pl.'s Mem. at 4–5, 24; see also id. at 26–27 (only discussing one paragraph of PIPS from prior solicitation). It appears to the Court that, in fact, the solicitations are not at all the same. For instance, and as pertinent to this case, in the 2017 solicitation, Technical Sub-factor 1.1 required

15

offerors to describe how they would meet each requirement in the PIPS. AR Tab 21 at 1674. In particular, offerors were required to describe how they would meet the characteristics requirements of PIPS section 5.4, which contained the provision at issue in this case, entitled "Launch Trajectory Profile." See id. Sub-factor 1.1, moreover, was the most important one for evaluation purposes. See id. at 1673 (observing that "all Sub-factors within each Factor are listed in descending order of their relative importance to each other"). The 2009 solicitation, by contrast, did not include a technical factor or sub-factor that required offerors to explain how they would meet each requirement in the PIPS or that required any specific demonstration with respect to launch trajectory. See id. Tab 44 at 5156–59.[5] Further, the 2009 solicitation treated all technical sub-factors as equal in importance, unlike the 2017 solicitation. Id. at 5174.

Moreover, Ultra has failed to persuade the Court that its proposals in response to the two solicitations were materially indistinguishable. To start with, the physical characteristics of its proposed device were not the same in its two proposals. Compare id. Tab 50 at 5354 with id. Tab 23 at 1794. Second, Ultra's statements with respect to launch trajectory were different. As noted, in addressing the requirement of PIPS section 5.4.8.5 in its 2017 proposal, Ultra referred to its device's physical characteristics and stated that "UVLDS will be performed to verify non-contact with the submarine." Id. Tab 23 at 1790. And in its response to questions raised in discussions, Ultra made conclusory statements and submitted a series of photographs. Id. Tab 35a at 4811–12. In its 2010 proposal, however, Ultra addressed launch trajectory in what appears to be greater detail. It included a graphic that not only referred to UVLDS testing, but included a sample trajectory plot. Id. Tab 50 at 5416. And in the text of its 2010 proposal, it compared the trajectories of its prior devices to the ADC MK 5 plans, and noted that "[g]reater trajectory separation from the launch platform is expected for the ADC MK5 due to the high mass/drag ratio." Id. at 5418. Ultra also discussed its "highly advanced modeling capability." Id. at 5435.

In short, the Court rejects Ultra's argument that the contracting officer had an obligation to attempt to reconcile the unacceptable rating assigned to Ultra's 2017 technical proposal with the outstanding rating that Ultra's technical proposal received as part of the 2009 procurement. The APA cases upon which Ultra relies are inapposite and, in any event, Ultra has not established that the solicitations and proposals for the two procurements were materially indistinguishable. This ground for protest is, accordingly, unavailing.

## CONCLUSION

For the reasons set forth above, Ultra's motion for judgment on the administrative record is **DENIED** and the government's motion for judgment on the administrative record is **GRANTED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

---

[5] The 2009 solicitation included a sub-factor entitled "Launchability." AR Tab 44 at 5158. That sub-factor made reference generally to "the launch requirements . . . in the [PIPS]," but made no specific reference to launch trajectory. Id. at 5158–59. It also included a number of additional requirements that appear to have no direct relationship to launch trajectory. See id.

16

**IT IS SO ORDERED.**

                                                s/ Elaine D. Kaplan
                                                ELAINE D. KAPLAN
                                                Judge